Good morning, Your Honors, and may it please the Court. My name is Jeremy Barron, and I'm here on behalf of Daniel Ramet. If I could, I'd like to save two minutes for rebuttal. Your Honors, Mr. Ramet received incompetent advice from his lawyer to turn down the plea deal and go to trial. This is a case where Mr. Ramet strangled his own daughter to death, admitted to doing it, and admitted that he had taken a break in the middle of strangling her. Based on those undisputed facts, a first-degree murder conviction was basically a foregone conclusion at trial. But the attorney unreasonably advised Mr. Ramet to turn down the deal because the attorney thought they had a really good shot at a manslaughter defense. That advice relied on critical, legal, and factual mistakes. And because Mr. Ramet relied on that unreasonable advice, he turned down the deal for 15 years to life, went to trial, was quickly convicted of first-degree murder, and is now serving a sentence of life without the possibility of parole. Mr. Ramet received ineffective assistance, and the Court should order the State to reoffer Mr. Ramet the deal. But you don't just want a new trial. You want him to have the opportunity to take the plea deal. Exactly. I believe the order would be the State would either release Mr. Ramet or reoffer him the deal, in which case it would go back to the State court for plea proceedings. Counsel, is there anything in the record that indicates that counsel for the appellant, Mr. Reed, had access to the jailhouse phone recordings that contained the admissions or compromising statements before the time when Reed recommended that the plea offer be rejected? Yes, Your Honor. So the phone calls were turned over to the defense before trial, and there was actually motions practice about the phone calls. The trial attorney had filed a motion to suppress the calls. That was unsuccessful. Then there was litigation about redacting the jail calls to omit references to the fact that he was in custody at the time he made those calls. And then it was at the very beginning of trial when the Court made the record about the plea deal being rejected. So the trial attorney did have access to those phone calls during the pretrial proceedings, and any reasonable attorney would have known it was imperative to review those calls with a fine-toothed comb. If the idea is you're going to go to trial and run a manslaughter defense, you need to know what the trial attorney or what the prosecution is going to be able to prove about your client's mental state. And the trial attorney knew that the prosecution intended to introduce those calls in their case-in-chief and should have looked through them very carefully. And if he had looked through them carefully, he would have realized Mr. Ramey made a series of damaging statements that were identical and, in fact, even worse than the testimony that he provided at trial. I mean, if you look at the jail calls, you know, he says that he started strangling her for a few minutes. He stopped for a couple minutes or a few minutes. Amy started to come to a little bit. He thought to himself, oh, well, you know, if she wakes up, maybe she'll have brain damage. And so he decided to continue strangling her. And that was the case. Sotomayor, could you clarify, please, what was the date on which the plea deal was offered? So I don't think the record is clear about when exactly the plea deal was formally offered. What we do know is at the very beginning of trial, before jury selection began, the Court made a record about the plea deal being offered, the prosecution agreed they'd offered a deal for 15 years to life, and the Mr. Ramey confirmed with his trial attorney that they had made a counteroffer and then turned that down. So I don't think we have a specific date in the record about when the deal was offered, but we do know that a deal was offered and apparently was on the table leading up to the trial. But what about the Nevada? Am I wrong that the Nevada Supreme Court said that the And he didn't. There's no evidence that he had access to these recordings at that time? Well, I've – what I think the Nevada Supreme Court said was the attorney based his advice on the evidence and was caught off-guard. But they didn't make a factual finding that the – that the jail calls were not accessible to the client during the negotiations. They just seemed to assume that because the attorney testified he was caught off-guard, that means that there was no deficient performance. But that's the kind of assumption that is an unreasonable application of Strickland and Lafler. And if you look at the U.S. Supreme Court's case in Wiggins v. Smith, if a Supreme – if a State supreme court just assumes that the – the trial lawyer's explanation is reasonable, that's an unreasonable application under 2254d. And that's what we have here. I believe the jail calls – I don't have an exact date, but I believe they were turned over to counsel relatively early in the case because, you know, the motions practice took place well before the trial started. Maybe I can nail those dates down in rebuttal. But I believe he had access to those calls at the time that these negotiations would have been going on. And if he had looked at them carefully, he would have realized they were absolutely critical to the prosecution and devastating for anything but first-degree murder. You know, first-degree murder case – But you're assuming that the offer was still on the table at the first day of trial? What makes you think that? Because usually if a plea offer is turned down, it expires, it goes away. There's no real record about whether it was or wasn't. The prosecution didn't say, we offered this, you know, the first day after the indictment or the information came out, and it expired on this particular date. They just said there was an offer that was extended, and the attorney and the client turned that down. So, again, I'll try and – I mean, I think it is critical to your case, and I've made in my notes a couple places, you know, have you established the access prior to the advice. So maybe when you sit down, if you can point us to the record, that would be helpful, because that's what I was looking for and was missing. Absolutely. I'll certainly do that. Counsel, let me ask you a related question. Let's assume for a moment, for argument, that counsel had access to those recordings, and those recordings seem to make it hard to believe there'd be a manslaughter conviction. But could there – if there had been a conviction for second-degree murder, as opposed to first-degree murder, then he would have still gotten a life sentence with a possibility of parole in a certain number of years. But would that number of years have been less or more than the 15 years? That probably would have been a 10-to-life for a second-degree murder conviction. But if Mr. Romet had gotten the advice, look, manslaughter is not on the table here, the best you can hope for is second, he would have taken the plea deal. He testified to that. And I think if you look at the counteroffer, that's very good evidence of that, because his attorney was telling him, you have a really good shot at manslaughter, and yet he was still willing to take a deal for 10-to-life, which would have ended second-degree murder. And so if his attorney had said, oh, the best that you can get out of a trial is 10-to-life, it's really not much of a stretch to think that he would have said, okay, 15-to-life is acceptable. And I see that I'm starting to get into my rebuttal time, so I'd like to reserve. Thank you. Kagan. May it please the Court, Jeffrey Conner on behalf of the Respondents. Good morning, Your Honors. I'd like to focus on two points this morning. The first thing I'd like to start with is that what we've just heard is a presentation of a new claim that was not presented in the petition nor to the Nevada Supreme Court. Petitioner counsel has represented that counsel's advice in this case was based both on a legal and a factual misrepresentation. If this Court looks at excerpts of record, page 69 through 71, it will find the allegations of ground two. Nowhere in the claim does it allege that counsel misrepresented the law or did not understand the law, nor is there an allegation that counsel did not review the evidence in this case. Those allegations do not appear in the petition. And so under Strickland, Strickland is very clear that in order to establish deficient performance under Strickland, the petitioner has to point to the acts or omissions that are alleged to have not been based on reasonable professional judgment. And here, by presenting an entirely new theory of exactly why counsel's advice was deficient, they are presenting a new claim. Strickland is clear that deficient performance is a mixed question of law and fact, and so by presenting a new theory of deficient performance that has never been before presented, we're faced with a claim that is based on both a new legal and factual theory for relief. But even aside from that, I don't think this Court needs to decide that issue to resolve this case. And the easiest way to resolve this case is to actually look at the supplemental authorities that the petitioner filed on Friday afternoon. He cites to Hernandez v. Chappelle for the proposition that this Court must look to counsel's stated explanations for his conduct. And if we look at the evidentiary hearing transcript in this case and look at counsel's testimony, do we see testimony that counsel was ignorant of the law on the homicide offenses at issue in this case? No, we don't. Do we see testimony that counsel didn't review all of the discovery that was provided to him? No, we don't. But what counsel did testify to is that, one, he never told his client that it was going to be a legal impossibility to be convicted of first-degree murder, and that the client always understood that first-degree murder conviction with a possible sentence of life without a possibility of parole was on the table. The second important thing is that counsel testified that he reviewed all of the discovery, all of the evidence with his client and with the full defense team, which included co-counsel, an investigator, and a mitigation specialist. They went through all this together. Counsel testified that they went through Mr. Ramey's testimony. I think it's at page 920 of the excerpts of record. He says, you know, his advice was based on his client's own statements. I don't want to say that we didn't talk about what he would say. They went through what his testimony was going to look like. And really what we're dealing with here is just that when the client actually got on the stand, it came out differently than counsel had anticipated. Finally, counsel testifies that the defense that was offered in this case was based on the idea that there was no premeditation and deliberation. This was not a first-degree murder, that this killing was committed in the heat of passion, and only if that passion was sufficiently aroused in the minds of the jurors that it would result in a manslaughter verdict. So counsel very clearly understood here the distinctions between the relevant homicide offenses and just made an error in judgment about what he thought — how he thought the jurors would review this case. That is the exact fact pattern that this case — this Court was presented with in Turner v. Calderon, where the client actually ended up being convicted of first-degree murder and sentenced to death. And this Court affirmed the denial of relief in that case. As this Court said in Turner, counsel is not expected to have a crystal ball and predict the outcome of the case. What counsel's job is, is to give his client the tools he needs to make an informed, intelligent decision on whether — whether to accept or reject the plea. Alito This is such bad advice that the lawyer gave to Mr. Rumey. But what you're saying — I know we have some students who came in a little late. This is a father who choked his adult daughter to death with his hands and stopped somewhere in the middle and then decided to go ahead and finish the job. Now, did they have a dysfunctional relationship? Sure. Had she told him he should kill himself because he's such a pathetic person? Yes. Were they meth addicts? Apparently. But how could any lawyer really think that his client could be convicted of a lesser charge under these facts? Now, I'm not asking you to defend that, but is it still in the nature of strategy when you make a terrible call if you think, I reviewed all the evidence, I understand the law, I went over it with my client, this is my opinion, in retrospect my opinion was wrong? I think to answer that, Your Honor, there's a — this Court in Turner kind of says that, no, counsel's just — if counsel makes the wrong call, that's not deficient performance. It's — it's dicta, I think, in Lafleur, where Justice Kennedy discusses the deficient performance prong because he doesn't — he says, I don't have to address this issue because the parties concede deficient performance. But he acknowledges that had counsel been wrong on the law, that shooting the victim below the waist was a legal defense to assault with the intent to commit murder, that that would have been deficient performance. But if counsel just thought that this was a persuasive argument to make to the jury that there was no intent to kill because you shot the victim below the waist, that that would not necessarily be deficient performance. And that — therein lies the — a major point in this case, because we're on AEDPA review here. This — this claim was addressed by the Nevada Supreme Court on the merits. And what this Court has to ask is whether under clearly established Federal law in Lafleur — that's not necessarily a holding in Lafleur. And if we look at Strickland, Strickland actually relies on McMahon v. Richardson, which is a guilty plea case addressing the — the standard for assessing counsel's performance. And that is the very case that this Court relied on in Turner v. Calderon and in Del Papa v. Womack, where this — that counsel has to make some sort of an egregious error along with just making an incorrect prediction on the outcome of the trial. Well, the — the, of course, Nevada Supreme Court said there really wasn't a claim of misunderstanding the law, correct? That's correct, Your Honor. I mean, that's — that's the opening point to my argument here, is that they've never alleged that before until they got to this Court. And so that issue of whether there was a mistake of law has not been presented before. That's an entirely new claim that I think is not properly before this Court, because it's not — it wasn't presented in State court, nor is it alleged in the petition. But, you know, in terms of ineffective assistance, he — he asks the jury in this very terrible situation that they have to put themselves in the — basically in the shoes of a reasonable person, and that's where Mr. Ramey found himself. Maybe following along with Judge Lasnik, that's just ludicrous in a case like this. I mean, you've got this child on the ground. You're going to really kill her off for her benefit. I mean, how — how can that be justified under ineffective assistance? I — I think what the district court did in this case is exactly right, that — that he may have overestimated the possibility of a manslaughter verdict and underestimated the possibility of a first-degree murder conviction, but that it was completely reasonable under the circumstances that Mr. Ramey found himself in, that the reasonable person standard, you have to place that reasonable person in the circumstances that the defendant found themselves in. So you have to consider all of the things that were going on in his life at the time and whether a reasonable person in that situation could have snapped and just, as a rash impulse, strangled his daughter. And — and counsel makes a very passionate argument in closing argument to the jury that even though there is this pause and that he chokes her again, that that doesn't necessarily establish that his continuing to choke her was not still a rash impulse that would, at the very least, then, only be second-degree murder, if not manslaughter. And so that's — that's the really important thing in this case, is that in their — in their briefing, they try to treat it as though manslaughter and murder were the only possibility — or first-degree murder were the only possibilities here. But in — in their own petition, they allege that counsel considered that it was either going to be manslaughter or second-degree murder. That's at page 71 of the excerpts of record. And so because counsel could have reasonably believed that his client was only guilty of second-degree murder, and that as Judge Gould's question went to, the possible sentence there was 10 to life as opposed to 15 to life, this distinction doesn't really — it doesn't really come down to whether or not he would have accepted that 15 to life or not. Because if he thought he was only guilty of second-degree murder, at most, then he's only facing 10 to life. Thank you. Thank you. I'd like to address the timeline. So the information in this case was August 24th, 2006. The motion to suppress the jail calls came in at December 27th, 2006. And that — he must have had the jail calls by that time because he filed a motion to suppress them. And then there's a calendar call on May 23rd, 2007. At the very start of it, the Court asks about negotiations. The prosecutor says, we're still discussing negotiations, but at this time, it doesn't look like there's going to be a deal. And that's at EOR 305. So he did have these jail calls when the negotiations were going on. The jail calls were absolutely devastating. The client admitted to taking this break and thinking, well, if she wakes up, you know, she might be hurt, so I better keep going. That is dispositive evidence of deliberation, which is really the key question for first-degree murder here is, was there premeditation and deliberation? He's saying, I stopped and then I thought if she woke up, so I decided to keep going. That is deliberation. It is also a devastating fact for manslaughter. You cannot get manslaughter if there's a period that gives the defendant the opportunity to cool off. Here, he admits he takes a two- or three-minute break. That's a cooling-off period. And I want to stress that in the prosecution's closing, and maybe the brief didn't make this point all that well, so I want to emphasize it here, the jail calls were the most important thing to the prosecution in closing. If you look at EOR 347, transcript pages 16 to 17, that's them playing it in the opening. They quoted from them at length in the closing, EOR 610 to 13, transcript pages 17 to 18 and 25 to 26, the prosecutor is reading from the jail calls, not the client's testimony, from the jail calls. And then in rebuttal, the prosecutor says, we have made, I guess you could say, a big deal about the jail phone calls. That's at EOR 620, transcript page 57. And then the prosecutor starts saying, well, you know, he's being truthful in his testimony, but he's minimizing a little bit in the jail calls. He's being much more honest and straightforward. So, jury, look at those jail calls. That's at EOR 621, transcript pages 58 to 59. So those calls were devastating. Any reasonable attorney would have seen that and advised the client accordingly. Unless there are any questions, I see I'm done. Thank you. Thank you. Thank both counsel for the argument. Ramey v. Legrand is submitted. We're adjourned for the day. Our law clerks are here. If the students want to talk with them and ask some questions, you're welcome to do so, or you're welcome to go on your way as well. Thanks very much. All rise.
judges: McKeown, Gould, Lasnik